RANDOLPH, Justice,
for the Court:
¶ 1. In this premises-liability case, the jury was presented with starkly conflicting stories about the facts surrounding the rape of L.R., an eleven-year-old girl, at Federation Tower, an apartment building where her father lived. As a result of the rape, L.R. was impregnated by Tony Kelly and gave birth to a normal, healthy child. L.R.’s father and mother brought suit, individually and on behalf of L.R., against the building owner, Mississippi State Federation of Colored Women’s Club Housing for the Elderly in Clinton, Inc. d/b/a Federation Tower; and the apartment management company, Southern Management Corporation (collectively “Federation”). A jury established L.R.’s total damages to be $200,000. The jury separately allocated fault: forty percent to Federation and sixty percent to her father. The trial court entered final judgment against Federation for $80,000 on June 20, 2008. Following post-trial motions, by order dated October 31, 2008, the trial court assessed fault entirely to Federation and ordered additur of $800,000 to the $200,000 total damages assessed by the jury, contingent upon acceptance. Judgment was then entered against Federation for $1,000,000. Neither party agreed to the additur. Federation appealed, asking this Court to reinstate the jury verdict. L.R. cross-appealed, seeking a new trial.

FACTS AND PROCEDURAL HISTORY

112. In the summer of 2000, L.R. often visited her father at Federation. She also helped the apartment manager, Gladys Miller, by doing office work and delivering notes to tenants throughout the building. Miller testified that she watched over L.R. and other children who visited the complex. Once school started in the fall of 2000, L.R. discontinued assisting Miller. L.R. then visited her father only on weekends when the office was closed and Miller was not present. During the week, L.R. lived in Jackson with her mother. Federation housed elderly and disabled persons, but it was not a nursing home. Kelly and L.R. testified that they first met when he was walking near the apartment complex. Kelly further testified that he had relatives and friends, including Reverend Ambrose Brown, whom he visited at Federation. The first sexual encounter occurred in September 2000. The jury heard and saw L.R.’s version of the events. She stated that she was returning from another apartment where her father had sent her on an errand, and that Kelly grabbed her, pulled her into a stairwell, and forcibly raped her. She further related that the apartment’s night manager, James Gray, saw this event, but walked by them, ignoring her calls for help. L.R. testified that afterwards, Kelly threatened to harm her father if she told anyone. She stated that *355 she had sex with Kelly on six other occasions, with Kelly forcing himself on her each time when she was alone in or near the stairwell. She said that the last of these events occurred in February 2001. By this time, L.R. was twelve years old.
¶ 3. In contrast, Kelly testified that L.R. let him into the building through a back door. He testified that “[he] didn’t force her to have sex with [him],” “never once held her down and forced her to have sex ...,” and “about ... four or five times we done had sex in her daddy’s [apartment].” Kelly disputed the claim that Gray or anyone else had witnessed them having sex. Kelly testified that L.R. would call him and tell him when to visit her. Derrick Moun-ger, Kelly’s friend and coworker, testified that a girl, who never identified herself, called him many times in 2000 and 2001, looking for Kelly. At least one call was from a phone at Federation.
¶ 4. Gray denied that he had witnessed a rape. However, he did observe on one occasion L.R. coming out of a stairwell and putting on her clothes. He testified:
I was doing my night round. I was going up the stairs. And all of a sudden I heard somebody running, and I speed-ed up.... So when I got to the top of the stairs and got right down the hall, she was standing there putting one of her things up on her shoulder and reaching and grabbing the other one to hook it.
He said that he thought that something of a sexual nature had occurred and that he then told L.R.’s father and Miller what he had seen. Miller testified that she had no knowledge of these incidents prior to the institution of this suit. She said, “I wish I had have. I might have done something about it.” She also testified that at the time of the incidents, a resident told her that she had seen L.R. in the stairwell with a man. Miller said this was what prompted her to tell L.R.’s father to keep L.R. in the apartment.
¶ 5. Other testimony was presented regarding the relationship between L.R. and Kelly. Rev. Brown, who lived on the same floor as L.R.’s father, said that Kelly visited him in his apartment and that, on one occasion in December 2000, L.R. had been there with them. Rev. Brown testified that, when L.R.’s father saw the three of them together on the couch in Rev. Brown’s apartment, her father told L.R. to leave.
¶ 6. Linda Morris, another of L.R.’s father’s neighbors, testified that L.R. confided to her that L.R. was in love and had kissed a man outside the door of her apartment. Morris further testified that once, when L.R. was in Morris’s apartment on the phone talking to someone, she said to Morris, “This is he. You want to talk?” Later, when Morris thought L.R. was watching television, L.R. left the apartment and returned saying, “He said he loved me. He kissed me.” When admonished by Morris for allowing someone in her apartment, L.R. replied, “He didn’t come in. He was outside the door.” Morris said L.R. never told her that anyone had raped her. Morris stated, “She would tell me, Tm practically raising myself,’ meaning her mama wasn’t there for her.” Morris said that L.R. “was lonesome. The child was lacking in love.” Morris also said that L.R. associated with another young girl, going from floor to floor in the building, and that L.R. had said, “There’s a cute boy out there. He like me.” Morris said that the apartment manager had told L.R.’s father that if he could not keep L.R. in his apartment, she should not be there. She recalled one occasion in which L.R.’s father had gone to sleep and then had to go out and look for L.R. Morris stated that there were other children at the apartment, but that their parents or *356 grandparents “kept them in the apartment.” Morris concluded that L.R.’s father was not “watching out for her like he should have been” and that it could have been prevented, but for the fault of L.R.’s parents.
¶ 7. In March 2001, L.R. told her mother that she was pregnant and that Kelly was the father. Using a phone number L.R. furnished, L.R.’s mother and older sister called Mounger, obtained Kelly’s full name, and reported him to the police. Kelly was later convicted of the crime of statutory rape[1] and served seven years in prison. .
¶ 8. In the months following the discovery of her pregnancy, L.R. received counseling at the Child Advocacy Center (“CAC”). As a part of this counseling, L.R. wrote a “Letter to the Perpetrator” in which she stated that she had believed that Kelly had loved and cared for her. She wrote, “I want to tell you that sometimes I love you & other times I don’t.”
¶ 9. L.R.’s parents, on her behalf, brought suit against Federation, and also brought individual claims for their separate emotional distress.[2] Initially, the trial court granted Federation’s motion for summary judgment, but the Court of Appeals reversed and remanded. See Minor Child ex rel. John Doe v. Miss. State Fed’n of Colored Women’s Club Hous. for the Elderly in Clinton, Inc., 941 So.2d 820, 831 (Miss.Ct.App.2006).
¶ 10. Upon remand, both sides presented motions in limine. L.R. moved to exclude reference to sexual molestation she experienced at ages five and eight. She argued that this would violate Mississippi Rule of Evidence 412. Federation countered that Rule 412 applies only in criminal cases and that L.R.’s psychological expert had downplayed the molestation events in his report, and had concluded that all of L.R.’s psychological problems had resulted from her encounters with Kelly. The trial court denied L.R.’s motion, stating that Rule 412 was inapplicable and that the evidence would be admitted, as it was relevant to damages. L.R. also moved to exclude evidence of consent, as she had been a minor. L.R. argued that, because minors are considered by criminal statute to be incapable of consent, Federation could not use evidence of consent in a civil case. The trial court also denied that motion, stating that “the issue of statutory rape... is not pertinent ....” as it did not affect the duty owed to L.R. by the landowner. L.R. further moved to exclude reference to a sexual encounter she had years later. Federation argued that this later consensual sex with a boy was relevant to damages and for impeachment, as L.R. had claimed that the encounters at Federation had left her unable to have relationships with males. The trial court granted L.R.’s motion.
¶ 11. Federation moved pretrial to exclude testimony from L.R.’s economic expert, Dr. Glenda Glover, on the cost of raising L.R.’s child. As no Mississippi caselaw existed on this subject, the parties relied on cases from other jurisdictions. Federation asserted that the majority rule is that a mother can recover for the ex *357 pense of giving birth, inter alia, but not for raising the child, as “the plaintiff gets the love and affection of the child as a benefit....” The trial court granted the motion, and Glover did not testify. Federation submitted another motion in limine seeking to dismiss L.R.’s mother’s emotional-distress claim. The court denied the motion.
¶ 12. Testimony was presented in an attempt to allocate fault to L.R.’s parents. At trial, the father’s deposition was read to the jury. He acknowledged that he had primary responsibility for L.R.’s supervision while she was visiting the apartment building, and that he had allowed her to leave his apartment and wander through the building by herself. He admitted that, before the incidents involving his daughter, he had seen several people in the building whom he believed to be trespassers. Specifically, he had seen a man whom he later learned was Kelly. He described Kelly as a “guy coming through there all the time dirty, nasty, smelling like beer and stuff....” Federation’s security expert, Warren Woodfork, testified that there was insufficient history of sex crimes at Federation and the surrounding area to make rape foreseeable, yet he opined that these unforeseeable rapes could have been prevented by parental supervision.
¶ 13. L.R. presented medical bills totaling $14,453.53 for prenatal care, sexually transmitted diseases, childbirth by caesarian section, and postnatal infections. Although she never sought treatment for emotional problems in the multiple years preceding trial, her psychiatric expert, Dr. Wood Hiatt, opined that approximately $50,000 in future psychiatric care would be required for her to overcome her problems. Dr. Hiatt testified that L.R. had “several different psychiatric diagnoses,” including post-traumatic stress disorder, depression, “personality quirks,” and paranoia, all of which were directly attributable to Kelly’s conduct. Dr. Hiatt testified that, except for school, L.R. was isolated, homebound, and unable to have normal relations with friends, and especially not any sexual relationships. He described L.R.’s subsequent sexual experience as L.R.’s unsuccessful attempt to become normal. He stated that she had gained weight intentionally to make herself unattractive to men.
¶ 14. Federation painted a different picture for the jury’s consideration, through other witnesses and cross-examination. The jury heard evidence that L.R. had been sexually molested at least twice by her stepbrother before the occurrences at Federation, which Federation argues accounted for some of her alleged emotional problems. The jury considered L.R.’s academic accomplishments, such as completing high school in the top third of her graduating class and attending community college. The jury also received evidence of L.R.’s postings on social-networking websites.
¶ 15. Denease Bishop, a CAC employee who interviewed L.R. in 2001, was tendered as an expert witness in forensic interviewing. The trial court sustained hearsay objections when Bishop was asked what L.R. had told her. L.R. argued that Bishop, as an expert witness, could consider hearsay. Bishop was allowed to testify, over Federation’s objection, that L.R. had “made a credible disclosure of rape.” Bishop based her opinion on the detail, consistency, and context of L.R.’s statements.
¶ 16. Regarding her emotional-distress claim, L.R.’s mother testified that she had had headaches, nausea, vomiting, and insomnia. On cross-examination, she revealed that she had been treated for depression before L.R.’s claim arose and that she had not seen a doctor for emotional *358 problems since. When asked if she had suffered any physical injury, she replied that she was “hurting deeply.” She testified that she was not present at Federation at the time of these events and did not know about them until the pregnancy manifested itself. She never went to Federation and knew very little about it. When the plaintiffs rested, Federation moved for a directed verdict on her claim. After considering whether bystander liability might control, the trial court granted the motion, comparing the damages she claimed to those rejected in Adams v. U.S. Homecrafters, Incorporated, 744 So.2d 786, 743-4 (Miss.1999).
¶ 17. Instruction C-29, as given to the jury, reads:
[I]f you find by a preponderance of the evidence that the defendants ... were guilty of negligence which caused or contributed to the rape incidents complained of, and you further find by a preponderance of the evidence that the negligence of [her father and mother] also contributed to the rape incidents in question, then you should answer the following question: What percentage of fault, if any, do you assign for each of the following parties or non-parties?
Blanks were provided for the jury to enter the percentages assigned to Federation and L.R.’s parents. L.R. objected to this instruction, arguing that Mississippi case-law did not permit allocation under the facts presented in this case. L.R.’s limited argument was that, since the sex had occurred in public areas, no one other than the property owner could be held at fault. L.R. did not offer argument that allocation of fault was legally improper. The court overruled the objection.
¶ 18. A separate form-of-the-verdict instruction (C-30) was given without objection. It read, ‘Tour verdict ... should be in one of the following forms: ‘We ... find for the plaintiff ... and assess her total damages in the amount of $_’ .... ” After deliberations began, the jury sent a note asking, inter alia, “Do we need to complete 29 & 30?” The court returned the following answer without objection:
If your verdict be for the plaintiff you will write your verdict as outlined in Instruction Number 30 completing it by filling in the blank with the total damages you find, and also complete Instruction Number 29.
If your verdict be for the defendants you will write your verdict as outlined in Instruction Number 30 and you need not complete Instruction Number 29.
Subsequently, the jury returned a unanimous verdict for L.R. and assessed her total damages to be $200,000. The jury unanimously apportioned fault as follows: mother zero percent, father sixty percent, and Federation forty percent.
¶ 19. L.R. filed a “Motion for Judgment Notwithstanding the Verdict (JNOV), or in the alternative New Trial, or in the alternative Additur.” At the first motion hearing, the trial court ruled that it had erred in instructing the jury to apportion fault. The trial court opined that insufficient evidence of negligence on the father’s part was presented. The litigants were offered the option of avoiding a new trial if they agreed to allow the court to consider addi-tur, as the trial court found the jury’s assessment of $200,000 to be inadequate. The trial court suggested $500,000 as an appropriate damages amount, but directed both parties to present argument regarding additur. At a subsequent hearing, the court granted additur of $800,000, increasing the award to $1,000,000. The trial court stated that, in arriving at the additur amount, it had not considered the cost of raising L.R.’s child. In its order, the trial court found, with the exception of allocation of fault and additur, that L.R.’s mo *359 tion for JNOV, or in the alternative, new trial, was “not well-taken and should be denied as to all counts.” The order gave the parties thirty days to consider the additur or seek other relief. Neither accepted the additur nor sought other relief of the trial court. After rejecting the ad-ditur, L.R. did not file a new motion for new trial in the trial court. Federation appealed, seeking to restore the jury verdict. The next day, L.R. cross-appealed, seeking a new trial from this Court and asserting, inter alia, that the additur was inadequate and did not cure the alleged errors at trial.

ISSUES

¶ 20. In its brief to this Court, Federation raised whether the trial court erred in: (1) “Reversing the jury’s 60% apportionment of fault to the father who the jury found failed to supervise and protect Plaintiff while she was under his care and custody”; and (2) “Rejecting the jury’s [total damages] of Two Hundred Thousand Dollars to Plaintiff, and in granting an additur of [$800,000, raising the total award to] One Million Dollars.” L.R. and her mother, as appellees and cross-appellants, claim the trial court erred in: (1) “Allowing the Jury to Apportion Fault to the Parents of the Minor Child”; (2) “Denying Plaintiffs Motion for a New Trial”; (3) “Granting Defendants’ Jury Instruction [C-29/apportionment]”; (4) “Denying Various Motions in Limine Submitted by the Plaintiff’; (5) “Granting Defendants’ Motion in Limine Regarding the Economic Cost of Rearing the Birth Child”; (6) “Dismissing All Claims of Party Plaintiff Jane Doe Parent”; and (7) “Limiting the Trial testimony of Plaintiffs’ Expert Witness Denease Bishop.” Federation raised an additional issue as cross-appellee: “Plaintiffs Have Waived Any Appeal of the Addi-tur Amount.”
¶ 21. For purposes of clarity, we rearrange the issues in the order they were considered by the trial court and merge them for consideration, as follows:
I. Whether the trial court erred in its rulings on L.R.’s motions in limine.
II. Whether the trial court erred in granting Federation’s motion in li-mine regarding the economic cost of raising a child.
III. Whether the trial court erred in sustaining hearsay objections to the testimony of L.R.’s expert witness, Denease Bishop.
IV. Whether the trial court erred in granting a directed verdict on the mother’s emotional-distress claim.
V. Whether the trial court erred in allowing apportionment of fault to the father or erred in reversing that decision.
VI. Whether the trial court erred in denying a new trial and ordering an additur in its post-trial order.
VII. Whether the trial court erred in failing to grant a new trial after additur was rejected by both parties.

STANDARD OF REVIEW

¶ 22. “ ‘[W]hen a question of law is raised, we apply a de novo standard of review.’ ” Corban v. United Servs. Auto. Ass’n, 20 So.3d 601, 609 (Miss.2009) (quoting Delashmit v. State, 991 So.2d 1215, 1218 (Miss.2008)). “An abuse-of-discretion standard of review is applied to the trial court’s admission or exclusion of evidence.” Hartel v. Pruett, 998 So.2d 979, 984 (Miss.2008) (citing Tunica County v. Matthews, 926 So.2d 209, 212 (Miss.2006)). The standard of review for a directed verdict or a judgment notwithstanding the verdict also is de novo. See United Am. Ins. Co. v. Merrill, 978 So.2d 613, 624 (Miss.2007). “ ‘In essence, judgments as a matter of law *360 present both the trial court and appellate court with the same question — whether the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.’” Id. (quoting White v. Stewman, 932 So.2d 27, 32 (Miss.2006)).

ANALYSIS

I. Whether the trial court erred in its rulings on L.R.’s motions in limine.
A. Consent
¶ 23. L.R. argued pretrial that evidence of consent was barred by criminal statute. See Miss.Code Ann. § 97-3-65(2) (Rev. 2006); Miss. R. Evid. 403. The trial court rejected this argument and denied the motion. In her arguments post-trial and on appeal, L.R. added a hearsay argument. Federation argues that L.R. has cited no relevant authority, thus, this Court need not review this issue. Federation asserts that: (1) the criminal statute is irrelevant to this civil suit; and (2) the hearsay argument comes too late and is not supported in the record.
¶ 24. This issue is a bit misleading, as Federation never attempted to disprove a crime occurred. It acknowledged throughout the trial and in jury instructions that L.R. was the victim of rape. Criminal statutes do not control evidentia-ry rulings in a civil trial, absent authority within the rules themselves. There being no such exception, the Rules of Civil Procedure control admissibility of evidence in this civil trial. Criminal and civil proceedings have different purposes. See Cynthia M. v. Rodney E., 228 Cal.App.3d 1040, 279 Cal.Rptr. 94, 97 (1991). Deterrence and punishment for criminal conduct are within the general province of our criminal law. The public’s interests are sufficiently protected by imposition of criminal sanctions. See Zysk v. Zysk, 239 Va. 32, 404 S.E.2d 721, 722 (1990). The dissent fails to address the fundamental unfairness of permitting civil litigants to obtain monetary judgments against nonperpetrators of the crime, while preventing the triers of facts from considering relevant evidence regarding damages and credibility. See LK v. Reed, 631 So.2d 604, 607 (La.Ct.App.1994); Doe v. Orangeburg County Sch. Dist. No. 2, 335 S.C. 556, 518 S.E.2d 259, 261 (1999). Civil actions for damages should be left to proceed under tort-law principles, addressing fault, damages, and credibility issues. See Doe v. Mama Taori’s Premium Pizza, LLC, 2001 WL 327906, at *7 (Tenn.Ct.App. Apr. 5, 2001).
¶ 25. L.R. asserts the following regarding hearsay:
The only evidence that [Federation] presented that the relationship was consensual were the claims of the perpetrator ... and inadmissible hearsay statements of neighbors of an T thought ... ’ nature as well as statements from therapy sessions where [L.R.] allegedly said that Tony Kelly told her he loved her. Under ... [rules] 801 and 802 this testimony should have never been admitted.
(Emphasis in original.) No hearsay objections were made during Kelly’s deposition testimony, and the trial record reveals no objections when the deposition was read to the jury. The only neighbors to testify were Morris and Rev. Brown. Prior to Morris’s deposition, the attorneys reserved all objections, except as to the form of the question. However, the trial record reveals no objections when Morris’s deposition was read to the jury. Rev. Brown testified about the time Kelly and L.R. were in his apartment, but claimed he could not remember what anyone said. He was then asked about a signed police statement in which he stated that Kelly *361 told him that L.R. liked Kelly. The trial court overruled a hearsay objection, as this was impeachment based on a prior inconsistent statement, but sustained an objection to admitting a copy of the statement into evidence. During Bishop’s testimony, the trial court sustained two hearsay objections when Federation asked what L.R. had told another CAC employee. Thus, L.R.’s hearsay argument has no support in the record.
¶ 26. “ ‘[T]he burden is on the appellant to demonstrate why the lower court was in error[,]’ and ‘we presume that the decisions of the lower courts are correct....’” Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay, 42 So.3d 474, 491-92 (Miss.2010) (quoting Oakwood Homes Corp. v. Randall, 824 So.2d 1292, 1294 (Miss.2002)). “The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision.” Mills v. Nichols, 467 So.2d 924, 931 (Miss.1985).
¶ 27. Federation argues that this Court should affirm the trial court ruling that allowed the evidence related to causation and relevant to damages. (See supra ¶ 12.) Federation stresses that it is not asking this Court to hold that “consent by a minor who is a victim of statutory rape constitutes an absolute defense to civil liability.” (Emphasis in original.) Federation has chosen wisely, for the same public-policy argument made by Justice Kitchens in his dissent would dictate that Federation would fail in such an endeavor, as it conflicts with the majority view. See Bjerke v. Johnson, 727 N.W.2d 183, 193-94 (Minn.Ct.App.2007) (collecting cases).
¶ 28. However, its admissibility in a civil trial is a different issue. A New York court has held that, as statutory rape has no consent element, a defendant who has pleaded guilty to that crime should not be estopped from claiming consent at a civil trial. Stavroula S. v. Guerriera, 193 A.D.2d 796, 797, 598 N.Y.S.2d 300, 301 (N.Y.App.Div.1993). The Tennessee Court of Appeals, in an unpublished opinion, collected cases showing the range of views on this issue. See Mama Taori’s, 2001 WL 327906, at *7. Some jurisdictions have adopted a per se civil-liability rule that would prevent a trier-of-faet from considering consent. Id. at *7 n. 13. Other jurisdictions have held that a “plaintiffs consent is relevant in civil proceedings and that the defendant may introduce evidence and cross-examine the plaintiff regarding this issue.”[3] Id. at *7. Others go further and hold it “fundamentally unfair to permit a civil litigant to obtain money damages while preventing the trier-of-fact from considering relevant evidence regarding damages and credibility.”[4] Id.
¶ 29. This Court has held that a relationship between a perpetrator and a victim may be relevant in premises-liability cases, requiring the plaintiff to show that the landowner did more than provide the *362 condition for the crime, but also to show that it impelled the crime. See Newell v. S. Jitney Jungle Co., 830 So.2d 621, 623-24 (Miss.2002); Davis v. Christian Bhd. Homes of Jackson, Miss., Inc., 957 So.2d 390, 405 (Miss.Ct.App.2007); Martin v. Rankin Circle Apartments, 941 So.2d 854, 864 (Miss.Ct.App.2006). The nature and extent of their overall relationship is in dispute (although no dispute exists as to the illegality of the rape). Given the conflicting evidence of the events before and after the sexual encounters, evidence of the acts and conduct of all involved was probative and relevant to liability, the duration and extent of damages claimed by the plaintiff, and credibility.
¶30. All can agree that L.R. suffered injury as a proximate result of the criminal acts of Tony Kelly, a nonparty. The jury found Federation liable, an issue not appealed. We can all agree that the issue of consent was irrelevant in the prosecution of Kelly for the crime of statutory rape. We can all agree that consent by a minor cannot be a bar to recovery, nor can it be posited as an affirmative defense. The acts and conduct surrounding the crimes were relevant to Federation’s defense that it was not negligent and to prove that others’ fault led to the plaintiffs damages. The trial judge was correct when he found that consent was not pertinent to the duty owed by the landowner, for rape was committed on the premises. Thus, he properly allowed the evidence and instructed the jury to determine whose conduct proximately caused L.R.’s injury and the nature and extent of L.R.’s damages. The jury heard conflicting testimony that L.R. not only called Kelly, but let him enter a back (or side) door to the building, as opposed to L.R.’s assertion that Kelly entered an unlocked door and subsequently threatened bodily harm to her father. Federation argues that it was within the exclusive province of the jury to determine the facts and circumstances surrounding the rape and accompanying claim of threats of violence to her father were less psychologically damaging. It was within the jury’s exclusive province to reject L.R.’s claim of being unable to have sex after these encounters, based on evidence presented at trial. The disposition proposed in Justice Chandler’s dissent would allow the jury to hear only the plaintiffs version of events and damages, and would preclude the defendants from presenting testimony to mitigate damages.
¶ 31. Jurors normally are instructed, as this jury was, that they “are required and expected to use [their] common sense and sound honest judgment in considering and weighing the testimony of each witness....” The decision of the jury, exercising its common sense and sound honest judgment regarding the evidence it saw and heard firsthand, should not be overturned by a Court, assuming that evidence supporting the verdict is found in the record and that the jury is properly instructed. See Miller Transporters v. Guthrie, 554 So.2d 917, 918 (Miss.1989).
¶ 32. Without adopting a blanket rule allowing such evidence in all civil trials, we find no abuse of discretion by the trial court in determining that the actions and conduct of all involved were appropriate for consideration, given that the defendants did not plead “consent”: (1) as a bar to the action; (2) as an affirmative defense; or (3) to disprove that a crime occurred. The conflicting events leading up to and following the rapes were presented to the jury and were both relevant and probative to causation, damages, and credibility. Thus, we find no error by the trial court.
B. Prior sexual molestation
¶ 33. L.R. argued pretrial that this evidence should be excluded, as it violated Rule 412. See Miss. R. Evid. 412. In her *363 post-trial motion and on appeal, she adds relevance arguments. The trial court denied the motion in limine, holding that Rule 412 applies only to criminal trials, and further, that the evidence was relevant to L.R.’s claim of damages. Federation argues that relevance need not be considered by this Court, as an objection on only one ground (Rule 412) waives objection on all other grounds (including Rule 403). See Burns v. State, 729 So.2d 208, 219 (Miss.1998), abrogated on another issue by Pitchford v. State, 45 So.3d 216, 246 (Miss.2010); Gary v. State, 796 So.2d 1054, 1056 (Miss.Ct.App.2001).
¶ 34. Rule 412(a) is as follows: “[I]n a criminal case in which a person is accused of a sexual offense against another person, reputation or opinion evidence of the past sexual behavior of an alleged victim of such sexual offense is not admissible.” Miss. R. Evid. 412(a) (emphasis added). We find no abuse of discretion in the trial court’s denial of the motion on this ground.
¶ 35. Federation asserts waiver for failure to argue relevance pretrial. However, a trial court is to consider relevance in all evidentiary decisions. Even were we not to apply the procedural bar, L.R.’s argument still misses the mark, for L.R. argues that this evidence is irrelevant to Federation’s duty to secure the building, an issue not raised on appeal. Federation argued and the trial court ruled that the evidence was relevant to L.R. ⅛ damages. In neither her post-trial motion nor her appellate brief does L.R. address its relevance vel non to damages. We find that L.R. failed to (1) argue the issue, (2) cite relevant authority, or (3) overcome the presumption of a correct decision. Notwithstanding the procedural bar, the evidence here was relevant. The jury received the testimony of L.R.’s psychiatric expert that the prior molestation had not harmed her and that all of her psychiatric problems had resulted from Kelly’s actions. However, the jury was not bound by this testimony. Credibility and weight accorded to expert testimony, like all witness testimony, is a decision for the jury. See Smith v. State, 925 So.2d 825, 839 (Miss.2006). The jury, exercising its common sense and sound honest judgment could have found the pri- or molestation to be relevant to the determination of L.R.’s damages. Thus, we find that L.R.’s assertion of error is without merit, as a prior injury is relevant to damages if pertinent to a plaintiffs damage claim. See Boyd v. Smith, 390 So.2d 994, 998 (Miss.1980).
C. Subsequent sexual history
¶ 36. L.R. asserts that the trial court erred by denying her motion. The trial court granted the motion. Testimony regarding L.R.’s subsequent sexual history was introduced by L.R. during her direct examination of Dr. Wood Hiatt. This Court need go no further in reviewing this assignment of “error.”
¶ 37. We find no error.
II. Whether the trial court erred in granting Federation’s motion in limine regarding the economic cost of raising a child.
¶ 38. L.R. asserts that it was error to exclude testimony on the cost of raising her child, citing two cases from other jurisdictions. L.R. also argues, for the first time in this appeal, that it would be unconstitutional for this Court to deny her those damages, given that pain and suffering damages have a statutory cap. This Court declines to consider the constitutional argument, as it comes too late and is not properly before the Court.
¶ 39. The admissibility of testimony related to the costs of raising a child is matter of first impression for this State. The overwhelmingly prevailing rule in other jurisdictions is that a child is not damage. Chaffee v. Seslar, 786 N.E.2d 705, *364 707-09 (Ind.2003). Even if it were otherwise, the benefits of having a child — a value impossible to determine — would have to be deducted from the award. See Girdley v. Coats, 825 S.W.2d 295, 298 (Mo.1992) (“an attempt to quantify the expense of raising a child and offsetting that expense by the ‘benefits’ conferred on the family is neither workable nor desirable.”).
¶ 40. L.R. cites only two cases, asserting that they represent a minority rule. See Jones v. Malinowski, 299 Md. 257, 473 A.2d 429 (1984); White v. Ohio Dep’t of Rehab. & Corr., 2005 WL 3642708 (Ohio Ct.Cl. Dec. 22, 2005). We think otherwise. In Jones, the court dealt with a birth that
occurred after an unsuccessful sterilization procedure. That court reasoned that it should allow damages for the expense of raising the child, deducted by the benefits gained, by holding that the doctor’s negligence had forced upon the couple the very burden they had sought to avoid.[5] Jones, 473 A.2d at 435-37. White is an unpublished opinion from the Ohio Court of Claims. It cites no authority and inexplicably defies the rule established by the Ohio Supreme Court. See White, 2005 WL 3642708, at *1; Johnson v. Univ. Hosps. of Cleveland, 44 Ohio St.3d 49, 540 N.E.2d 1370, 1378 (1989). The Johnson Court stated:
[I]n a “wrongful pregnancy” action, Ohio recognizes the “limited damages” rule which limits the damages to the pregnancy itself and does not include child-rearing expenses. The extent of recoverable damages is limited by Ohio’s public policy that the • birth of a normal, healthy child cannot be an injury to her parents.
Johnson, 540 N.E.2d at 1378.
¶ 41. A New York court, in a case involving the rape of a woman in a coma, stated, “Damages cannot be recovered for the ‘wrongful birth’ of a healthy child.” Doe v. Westfall Health Care Ctr., Inc., 303 A.D.2d 102, 755 N.Y.S.2d 769 (2002) (citing O’Toole v. Greenberg, 64 N.Y.2d 427, 488 N.Y.S.2d 143, 477 N.E.2d 445 (1985)). The O’Toole Court discussed this issue at great length, as it was a matter of first impression in New York. O’Toole, 488 N.Y.S.2d 143, 477 N.E.2d at 447-48. The Court held “that the birth of a healthy child, as but one consequence of defendant’s tor-tious conduct, does not constitute a harm cognizable at law.” Id. at 448.
¶42. The Supreme Court of Indiana collected cases on the issue of allowing damages for the cost of raising a child born as a result of a negligently performed sterilization. Chaffee, 786 N.E.2d at 707-09. The “vast majority of jurisdictions” oppose allowing recovery.. Id. Chaffee lists four states that allow recovery of child-rearing costs without offset for benefits. Id. at 707. Three states allow recovery offset by benefits. Id. at 707-08. Thirty states and the District of Columbia would deny an award for child-rearing expenses to the parents of a healthy child. Id. at 708 n. 2.
¶ 43. We are persuaded that the view held by an overwhelming majority of jurisdictions is sound, and we cannot say that the trial court erred.
III. Whether the trial court erred in sustaining hearsay objections to the testimony of L.R.’s expert witness, Denease Bishop.
¶ 44. L.R. argues that she was prejudiced by the trial court’s limiting *365 Bishop’s expert testimony. L.R. alleges, without explanation, that preventing Bishop from repeating what L.R. had told her was a violation of the expert-witness rules. See Miss. R. Evid. 702, 703. L.R. was not prejudiced by the trial court’s sustaining Federation’s objections. Even if the trial court had allowed Bishop to testify to the specifics of L.R.’s version of events, it would have been cumulative evidence, as other witnesses (L.R.; Robert Mahaffey, a policeman; John Tisdale, a security expert; Dr. Hiatt; L.R.’s mother; and Morris) testified on the same subject matter. Further, Bishop was allowed to testify that L.R. had “made a credible disclosure of rape.” We find no merit in L.R.’s argument on this issue.
IV. Whether the trial court erred in granting a directed verdict on the mother’s emotional-distress claim.
¶ 45. Federation successfully argued at trial that the mother’s claims of the consequences of emotional distress (untreated headaches, stomachaches, and insomnia) did not meet the standard set by caselaw. See Adams, 744 So.2d at 743-44. The Adams Court found that “vague testimony about loss of sleep and worry ... was insufficient to support an instruction or award of damages for emotional distress.” Id. at 744.
¶ 46. The mother counters that her claims were sufficient evidence of a physical manifestation of emotional distress. Alternatively, she cites cases stating that no physical injury is required under certain circumstances. See Sears, Roebuck & Co. v. Devers, 405 So.2d 898 (Miss.1981) (implied overruling recognized by Adams, 744 So.2d at 741-42); First Nat’l Bank v. Langley, 314 So.2d 324, 338-39 (Miss.1975) (abandoning the impact rule). She asserts that no physical injury is required, as this was not a case of simple negligence.[6] However, Langley and the other cases cited are inapposite. The plaintiffs in Langley, Devers, and Adams were the persons upon whom the negligent conduct was inflicted, not third persons who only heard about it later. See Adams, 744 So.2d at 737; Devers, 405 So.2d at 899, Langley, 314 So.2d at 325. Here, she testified that she was not present during any of these events. Nothing in the record indicates that she was ever on the premises. She does not qualify as a bystander, thus, she has no bystander claim. See Ill. Cent. R.R. Co. v. Hawkins, 830 So.2d 1162, 1174 (Miss.2002) (quoting Summers v. St. Andrew’s Episcopal Sch., Inc., 759 So.2d 1203, 1210 (Miss.2000)).
¶ 47. This Court has adopted the Dillon factors “in determining whether a defendant should reasonably foresee injury to a plaintiff, thereby owing a duty of care.” Summers, 759 So.2d at 1210 (citing Dillon v. Legg, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968)). The factors are:
(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.
Dillon, 441 P.2d at 920.
¶ 48. This Court in Summers dealt with mental-anguish claims by parents based on an alleged sexual assault on *366 their child at school. Summers, 759 So.2d at 1206. The Summers Court considered a case in which a federal district court granted summary judgment, finding that family members could not recover mental-distress damages after witnessing the mistreatment of their mother. See Campbell v. Beverly Enters., 724 F.Supp. 439, 440 (S.D.Miss.1989). The Campbell court concluded that family members could recover if they had sustained or been threatened with physical injury. See id. Summers also cited Moore v. Kroger Company, 800 F.Supp. 429, 433 (N.D.Miss.1992), in which the plaintiff argued that Campbell allowed for recovery for gross or wanton negligence even when the plaintiff was “outside the zone of danger and outside the range of immediate sensory perception.” Summers, 759 So.2d at 1210. However, the Moore court held otherwise, reasoning that the emotional distress at issue was that of the immediate victim, and that the “range of foreseeable plaintiffs does not include after-the-fact witnesses of the results.” Id. (citing Moore, 800 F.Supp. at 433-34). The Summers Court held that the parents did not meet the bystander criteria, as they were not near the scene, “nor was their shock caused by ‘contemporaneous observance of the accident.’ ” Summers, 759 So.2d at 1210. L.R.’s mother, like the Summers plaintiffs, meets only one of these factors, thus, she cannot be considered a bystander to whom the defendant owed a duty of care. In dicta, the Summers Court discussed the plaintiffs’ putative claim that they might be due relief if the defendant’s alleged conduct had been willful, wanton, malicious, or intentional. See id. at 1210-11. However, the Summers Court concluded there was no evidence to support the claim. Id. at 1211.
¶49. Here, the trial court considered the bystander-liability issue but in the end decided that proof of damages to support her claim was lacking. As the trial court’s decision was in accord with this Court’s precedent and consistent with the testimony offered at trial, we find no error in granting a directed verdict regarding L.R.’s mother’s claim of emotional distress.
Y. Whether the trial court erred in allowing apportionment of fault to the father or erred in reversing that decision.
¶ 50. The parties dispute whether allocation of fault to a parent is barred. Federation asserts that application of parental-immunity cases, which predate the comparative-fault era, is not justified. L.R. argues the parental-immunity bar extends to allocation of fault, citing Lucas v. Mississippi Housing Authority Number 8, 441 So.2d 101 (Miss.1983); and Bunch v. Shaw, 355 So.2d 1383 (Miss.1978). However, the trial court was not presented with the issue as now argued by the plaintiff. At trial, the court allowed allocation, rejecting L.R.’s argument then presented, ie., allocation to anyone other than the named defendants was improper, based on L.R.’s testimony (which was disputed) that all sexual encounters occurred in the public areas of the building. Lucas was never discussed until the post-trial motions. Post-trial, the trial court reversed itself, not for the legal reason now being presented, but on a factual basis, i.e., lack of evidence. As Federation argues, the trial court essentially entered a judgment notwithstanding the verdict regarding allocation of fault to L.R.’s father, which Federation submits is neither factually nor legally correct. As we find that the trial court was factually correct, we shall refrain from passing judgment or offering opinion on the legal issue of allocation of fault, it being unnecessary to resolve this case.
¶ 51. At a post-trial motion hearing, the trial court stated:
*367 I am of the opinion that I was wrong, that I assessed and interpreted the allegations and the testimony that came in as establishing a possible negligence on the part of the father. On reconsideration and after a review of all the testimony as I recall it, I see that there’s nothing that this father did that led to or contributed to this rape.
The trial court stated in its order:
[L.R.J’s motion is not well-taken and should be denied on all counts, except ... on the issue of apportioning fault ... whereby the Court finds that it erred ... and hereby reverses its ruling by removing the jury’s apportionment of fault.... This Court further finds that the $200,000.00 jury verdict was inadequate and grants an additur of $800,000.00....
¶ 52. As the court’s decision was essentially a judgment as a matter of law, this Court applies that standard to the trial court’s reversal of the jury’s verdict. “ ‘The judge may not substitute his judgment for that of the jury merely because he would have decided the matter differently.’ ” Shelton v. Coleman, 323 So.2d 90, 91 (Miss.1975) (quoting Ill. Cent. R.R. Co. v. Harrison, 224 Miss. 331, 338-39, 80 So.2d 23, 26 (1955)). “[A] verdict is deemed against the overwhelming weight of the evidence when no reasonable hypothetical juror could have reached the conclusion of the jury.” Blossman Gas Inc. v. Shelter Mut. Gen. Ins. Co., 920 So.2d 422, 426 (Miss.2006).
¶ 53. Thus, we must examine the record for evidence that would support a finding that her father breached an established duty as a parent to provide adequate supervision of L.R., which proximately caused her damage. We agree with the trial court that the criticism of some witnesses fails to rise to a level of a breach of a defined duty that caused or contributed to this rape. Thus, the jury received improper instruction on allocation of fault based on the facts as presented in this case. We affirm the trial court’s decision.
¶ 54. Although the trial court styled it differently, the judge essentially issued a judgment non obstante veredicto, meaning a judgment “[w]ith the verdict not standing in the way.” Russ Versteeg, Essential Latin for Lawyers 148 (Carolina Academic Press 1990). Although a basis existed for the trial court to reverse itself on allocation of fault, no legal or factual basis existed for the trial court to substitute its opinion for that of a unanimous jury that determined L.R.’s total damages to be $200,000. The standard for JNOV was not met. Unless other error justified a new trial, the jury verdict should stand fast. “A jury’s verdict is given great deference by this Court, and ‘conflicts of evidence presented at trial are to be resolved by the jury.’ ” Causey v. Sanders, 998 So.2d 393, 403 (Miss.2008) (quoting Johnson v. St. Dominics-Jackson Mem’l Hosp., 967 So.2d 20, 23 (Miss.2007)).
VI. Whether the trial court erred in denying a new trial and ordering an additur in its post-trial order.
¶ 55. A court’s consideration of additur is governed by statute and caselaw. See Miss.Code Ann. § 11-1-55 (Rev.2002); Dedeaux v. Pellerin Laundry, Inc., 947 So.2d 900, 908-09 (Miss.2007). Dedeaux states that a “party aggrieved by the amount of damages awarded pursuant to a jury verdict may file a motion for an additur.... ” Dedeaux, 947 So.2d at 908. L.R. filed a motion that included a plea for additur as one alternative.
¶ 56. L.R. maintains that the trial court erred by denying her motion for a new trial and in ordering an additur, which *368 was, in the alternative, the relief sought. The additur statute allows a trial judge to “overrule a motion for a new trial ... upon condition of an additur.... ” Miss.Code Ann. § 11-1-55 (Rev.2002). Based on our analysis, we find that the trial court was not in error for denying a new trial, as a new trial was not warranted for the reasons sought, although the trial court’s decision was reached through a different analysis.
¶ 57. The trial court’s additur order includes no findings of fact. The record reveals that the trial court expressed shock at the amount of the award, but the trial court failed to make a finding that the jury was influenced by bias, passion, or prejudice; or that the verdict was contrary to the overwhelming weight of the evidence. A finding of one of these is a prerequisite to setting aside a jury verdict. See Dorrill v. State Highway Comm’n of Miss., 525 So.2d 1333, 1335 (Miss.1988).
¶ 58. “Awards set by jury are not merely advisory and generally will not be ‘set aside unless so unreasonable as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.’ ” Patterson v. Liberty Assocs., L.P., 910 So.2d 1014, 1020-21 (Miss.2004) (quoting Rodgers v. Pascagoula Pub. Sch. Dist., 611 So.2d 942, 945 (Miss.1992)). “‘Additurs represent a judicial incursion into the traditional habitat of the jury, and therefore should never be employed without great caution.’ ” Patterson, 910 So.2d at 1021 (quoting Gibbs v. Banks, 527 So.2d 658, 659 (Miss.1988)).
¶ 59. A statute and our case-law require findings before a judge may grant an additur. See Miss.Code Ann. § 11-1-55 (Rev.2002); Dorrill, 525 So.2d at 1334-35. The statute allows a court to order an additur if it finds “that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence.” Miss. Code Ann. § 11-1-55 (Rev.2002). The Dorrill Court stated:
before the trial judge may usurp the jury’s function in setting a damage award, he must comply with the language of the statute.... Absent either of these findings, the trial court abuses its discretion in ordering a new trial based upon the non-acceptance of an additur or remittitur....
Dorrill, 525 So.2d at 1334-35. Here, the trial court failed to make either finding, and thus, the court abused its discretion. Even without this procedural flaw, the result would be the same. Evidence, as recounted above, existed to support the jury’s verdict, and nothing in the record reveals that the jury was influenced by bias, prejudice, or passion. Further, the trial court erred, as the jury verdict was not “so unreasonable as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.” Patterson, 910 So.2d at 1020-21. Jury awards of much less have been affirmed for similar injuries. See Doe ex rel. Doe v. N. Panola Sch. Dist., 906 So.2d 57, 59, 63-64 (Miss.Ct.App.2004) (denial of additur to award of approximately $20,000 to the family of a retarded girl repeatedly sexually assaulted at school); Doe ex rel. Doe v. Salvation Army, 835 So.2d 76 (Miss.2003) (boys sexually abused at summer camp awarded $30,000 each).
¶ 60. We find that the trial court abused its discretion in ordering additur, but did not err in denying a new trial.
VII. Whether the trial court erred in failing to grant a new trial after additur was rejected by both parties.
¶ 61. Both parties cite Dedeaux. Federation argues that L.R. has waived *369 her right to seek a new trial on appeal, for her remedy, if dissatisfied, was to demand a new trial on damages before the trial court. This Court stated the following in Dedeaux:
If the trial judge grants a motion for an additur ..., such grant ... shall take effect only if accepted by all the parties. If all the parties do not agree to the additur ..., then each party shall have the right to either demand a new trial on damages, or appeal the order asserting an abuse of discretion on the part of the trial judge.
Dedeaux, 947 So.2d at 908. Once the trial judge ordered the additur, each party had three options: (1) accept the additur, (2) demand a new trial on damages, or (3) appeal. Neither chose option one or two. Federation sought appeal first on December 2, 2008. The next day, L.R. chose the same course. L.R. now argues she was denied her right to a new trial on damages. Dedeaux is silent on which right — to appeal or to demand a new trial — takes precedence. However, as both parties chose to appeal, the issue of a new trial on damages is not before the Court. L.R. exercised her right to request a new trial based on alleged errors during the course of the trial and renewed those requests in this appeal. However, to the extent L.R. asks this Court to grant a new trial based on the asserted inadequacy or impropriety of the additur, that issue is moot, as we have found that granting the additur was error.

CONCLUSION

¶ 62. We reverse the judgment of the Circuit Court of the First Judicial District of Hinds County and remand the case for entry of a final judgment in the amount of $200,000 against Federation.
¶ 63. ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: REVERSED AND REMANDED.
CARLSON, P.J., DICKINSON AND LAMAR, JJ„ CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY PIERCE, J. WALLER, C.J., AND GRAVES, P.J., NOT PARTICIPATING.

. "The crime of statutory rape is committed when: ... [a] person of any age has sexual intercourse with a child who: (i) Is under the age of fourteen (14) years; (ii) Is twenty-four (24) or more months younger than the person; and (iii) Is not the person’s spouse.” Miss.Code Ann. § 97-3-65(l)(b) (Rev.2006). Neither the victim's consent nor the victim’s lack of chastity is a defense to this crime. See Miss.Code Ann. § 97-3-65(2) (Rev.2006).

. Her father’s individual claim was voluntarily dismissed, as he died before trial. The trial court dismissed her mother's claim by granting a directed verdict.

. Beul v. ASSE Int'l, Inc., 233 F.3d 441, 450-51 (7th Cir.2000); Cynthia M., 279 Cal.Rptr. at 97 ("The different treatment civilly of the concept of consent is striking.”); McNamee v. A.J.W., 238 Ga.App. 534, 519 S.E.2d 298, 302-03 (1999); Parsons v. Parker, 160 Va. 810, 170 S.E. 1, 2-3 (1933); Michelle T. by Sumpter v. Crozier, 173 Wis.2d 681, 495 N.W.2d 327, 329 (1993) ("evidence that [minor] had consented to the touching would defeat the civil battery charge brought against [assailant]” (emphasis in original)).

. Orangeburg County, 518 S.E.2d at 261; Reed, 631 So.2d at 607 ("The credibility of the participants is an essential determination in a civil suit for sexual assault.” "[W]e disagree with the trial judge’s legal conclusion that age alone can fully invalidate consent to sexual intercourse. We believe the better analysis must include the principles of comparative fault.”).

. In subsequent cases, Maryland has declined to extend this narrow holding. See Kassama v. Magat, 368 Md. 113, 792 A.2d 1102, 1115 (2002) ("wrongful life” claims not cognizable). See also Gaver v. Harrant, 316 Md. 17, 557 A.2d 210, 217 (1989).

. She did not advance this argument at trial, but did so in her post-trial motion.