# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00035-COA

PILOT TRAVEL CENTERS, LLC AND GINA          APPELLANTS
FRANKLIN, INDIVIDUALLY

v.

WILLA WOMACK          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/26/2022 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | GREGORY TODD BUTLER D. STERLING KIDD MALLORY KAYE BLAND JOHN PATRICK McMACKIN |
| ATTORNEYS FOR APPELLEE: | JAMES ASHLEY OGDEN JAMES W. SMITH JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 12/17/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**SMITH, J., FOR THE COURT:**

¶1.    Willa Womack sustained multiple injuries when she slipped and fell on a collapsed wet-floor sign lying flat on its side as she entered a Pilot Travel Center (Pilot) in Hinds County, Mississippi. Womack filed a premises-liability lawsuit against Pilot Travel Centers LLC and Gina Franklin, individually, as the general manager of the Pilot where the incident occurred. Following a trial in the Hinds County Circuit Court, a jury found that the Appellants' negligence in maintaining the premises in a reasonably safe condition had solely

and proximately caused Womack's fall and subsequent injuries. The jury awarded Womack $393,000 in economic damages and $3,000,000 in non-economic damages. In accordance with the monetary limit set forth in Mississippi Code Annotated section 11-1-60(2)(b) (Rev. 2019), the circuit court reduced Womack's award of non-economic damages to $1,000,000, resulting in a total monetary award to Womack of $1,393,000.

¶2. On appeal, the Appellants assert the following: (1) the collapsed wet-floor sign failed to constitute an unreasonably dangerous condition; (2) Womack failed to prove that the Appellants had notice of the collapsed wet-floor sign; (3) the circuit court erred by denying the Appellants' motion for a new trial; and (4) Womack's monetary award for non-economic damages was excessive and should be further remitted. Upon review, we find no reversible error. We therefore affirm the circuit court's amended final judgment.

## FACTS

¶3. Womack suffered injuries to her neck, back, and knee when she slipped and fell on a collapsed wet-floor sign as she entered Pilot around 11 a.m. on January 6, 2020. According to the testimony of a former Pilot employee who was working at the time of Womack's fall, employees usually mopped the convenience store's floors each morning between 5:30 a.m. and 6 a.m. To alert customers that the floor might be wet, employees would set out wet-floor signs. On the morning of Womack's fall, a wet-floor sign stood inside the store's vestibule, which was a small enclosed area that separated the parking lot from the store's interior. The vestibule had a set of two glass doors on each side. One set of glass doors led to the store's parking lot and gas pumps, and the opposite set of glass doors led into the main area of the

2

store.

¶4.　At 10:50 a.m. on January 6, 2020, the wet-floor sign was still in place. At that time, Pilot's security cameras recorded a customer knocking over the sign as he exited the doors leading from the main part of the store and proceeded through the vestibule on his way to the parking lot. Over the next ten minutes, the collapsed wet-floor sign remained on the vestibule floor as customers continued to enter and exit Pilot. At several different points during the ten-minute interval, Pilot's security cameras captured various customers stepping on, slipping on, or skirting around the collapsed sign. The security cameras also captured Franklin, Pilot's general manager, walking directly in front of, nearby, or facing the doors leading into the vestibule as she set up a hot dog station a few feet away.

¶5.　Around 11 a.m., Womack entered Pilot from the parking lot. As Womack walked diagonally across the vestibule to enter the main part of the store, she slipped on the collapsed wet-floor sign, hit her head on the glass doors leading into the store, and then struck her knees on the vestibule floor. Ultimately, Womack required an ambulance to transport her to the hospital for treatment.

¶6.　In August 2020, Womack filed a premises-liability lawsuit against the Appellants. Following a trial, the jury found that the Appellants' negligence was the sole and proximate cause of Womack's fall and subsequent injuries and awarded damages as previously described. After a reduction by the circuit court to comply with statutory guidelines, Womack's monetary award totaled $1,393,000. Following the circuit court's entry of its amended final judgment, the Appellants unsuccessfully moved for judgment notwithstanding

3

the verdict (JNOV) or, alternatively, a new trial. Aggrieved, the Appellants appeal.

## DISCUSSION

### I. Dangerous Condition

¶7. The parties do not dispute that Womack was an invitee on Pilot's premises. Although we recognize that a business owner "is not an insurer against all injuries" on his premises, "the 'owner still owes a duty to an invitee to exercise reasonable or ordinary care to keep the premises in a reasonably safe condition or warn of dangerous conditions not readily apparent, which [the] owner . . . knows of, or should know of, in the exercise of reasonable care.'" *Rhodes v. RL Stratton Props. LLC*, 376 So. 3d 385, 389 (¶11) (Miss. Ct. App. 2023) (quoting *Vu v. Clayton*, 765 So. 2d 1253, 1255 (¶7) (Miss. 2000)). "[M]ere proof that the invitee fell and was injured while on the premises is insufficient to establish liability." *Carroll v. Singing River LLC*, 309 So. 3d 567, 570 (¶6) (Miss. Ct. App. 2020) (quoting *Patterson v. Mi Toro Mexican Inc.*, 270 So. 3d 19, 21 (¶7) (Miss. Ct. App. 2018)). Rather, "in every premises-liability case, the plaintiff must show that a dangerous condition exists." *Keckley v. Estes Equip. Co.*, 276 So. 3d 1230, 1236 (¶18) (Miss. Ct. App. 2018) (quoting *McCullar v. Boyd Tunica Inc.*, 50 So. 3d 1009, 1012 (¶13) (Miss. Ct. App. 2010)). "Proof that a dangerous condition actually caused the invitee's injury 'is an essential element of the claim' because 'a property owner cannot be found liable for the plaintiff's injury where no dangerous condition exists.'" *Carroll*, 309 So. 3d at 570 (¶7) (quoting *Patterson*, 270 So. 3d at 21 (¶7)). "Whether a dangerous condition exists may be a question of fact for the jury." *Keckley*, 276 So. 3d at 1236 (¶18).

4

¶8. Here, the Appellants contend that a collapsed wet-floor sign fails to constitute an unreasonably dangerous condition sufficient to impose liability on them for Womack's fall. They instead argue that the collapsed wet-floor sign was "a safety feature, not an unreasonably dangerous condition" and that "it would turn premises-liability law on its head to find negligence based on items used to prevent injuries." According to the Appellants, the collapsed wet-floor sign inside Pilot's vestibule amounted to one of the "usual dangers that customers normally expect to encounter on a business's premises," and therefore, the collapsed sign "fail[ed] to constitute [a] reasonably dangerous condition[.]" *Martin v. Trustmark Corp.*, 292 So. 3d 245, 248 (¶12) (Miss. Ct. App. 2019).

¶9. For support, the Appellants reference an unreported case from Michigan in which a woman "tripped over a collapsed wet[-]floor sign" that "was lying partially underneath a table and partially in the travel aisle of defendants' Taco Bell." *Salisbury v. Sundance Inc.*, No. 271328, 2006 WL 3826753, at *1 (Mich. Ct. App. Dec. 28, 2006). The trial court in *Salisbury* granted summary judgment to the defendants after finding "the collapsed wet[-]floor sign was an open and obvious danger, and . . . no special aspects existed." *Id.* On appeal, the Michigan Court of Appeals explained that "the collapsed wet[-]floor sign was an open and obvious danger if it was reasonable to expect that an average person of ordinary intelligence would have discovered it upon casual inspection." *Id.* at *2. The appellate court noted the plaintiff's acknowledgment that the collapsed wet-floor sign was visible and that her companion had avoided tripping over it. *Id.* at *3. The *Salisbury* court concluded that "the sign was visible to anyone who looked in its general direction, the sign was

5

avoidable[,]" and the plaintiff had failed to demonstrate otherwise. *Id.* As a result, the appellate court held that the open-and-obvious doctrine barred the plaintiff's premises-liability claim. *Id.*

¶10. While *Salisbury* considered a fall caused by a collapsed wet-floor sign, the parties here do not dispute that in Mississippi, the open-and-obvious doctrine no longer serves as either an absolute defense to or a complete bar to recovery in premises-liability claims. *See Vivians v. Baptist Healthplex*, 234 So. 3d 304, 308 (¶¶17-18) (Miss. 2017). Upon review of current Mississippi caselaw involving premises-liability claims, we find our analysis in *Keckley* to be particularly relevant to the circumstances of the present case.

¶11. In *Keckley*, we addressed a very similar argument to the one the Appellants proffer here. The discussion in *Keckley* centered on yellow caution tape, another safety item intended to prevent injuries, and the defendants' contention that the caution tape constituted the type of "normally encountered dangers" a customer must expect to find on a business's premises. *Keckley*, 276 So. 3d at 1236-37 (¶19). Keckley, the injured customer, tripped over a piece of yellow caution tape that lay across a sidewalk outside a convenience store. *Id.* at 1233 (¶1). Keckley stated that although the caution tape was lying flat on the ground as she approached, the wind suddenly blew the tape off the ground as she attempted to step over the tape. *Id.* Keckley asserted that the caution tape essentially acted as a tripwire, and she only realized after her fall "that the tape was tied to a pole on one side of the sidewalk and a brick pillar on the other." *Id.* In granting summary judgment to the defendants, the circuit court found "that the open and obvious yellow caution tape at issue [wa]s not an unreasonably

6

dangerous condition as a matter of law. *Id.* at 1235 (¶13).

¶12. On appeal, this Court explained that we would have agreed with the defendants' argument that yellow caution tape constitutes the type of danger normally encountered on a business's premises if Keckley had alleged that "ordinary caution tape . . . strung three or four feet off the ground for the purpose of limiting customers' access to an area of the premises" had caused her injuries. *Id.* at 1237 (¶21). Keckley, however, testified that the caution tape "looked as though it was loose and had been discarded," and "the sudden wind gust caused it to function as a tripwire." *Id.* (internal quotation marks omitted). We noted that in *Keckley* that "the tripwire-like effect of the caution tape was hidden and surprising" and that customers do not normally "expect to encounter tripwires on a business['s] premises." *Id.* at 1237-38 (¶¶22-23) (citation and internal quotation mark omitted). We therefore held that the change in nature of "the alleged defective condition[,]" which occurred "suddenly and without warning[, was] sufficient for a reasonable jury to conclude that [the yellow caution tape] create[d] an unreasonable or unusually dangerous condition." *Id.* at 1238 (¶23) (quoting *Cox v. Wal-Mart Stores East L.P.*, 755 F.3d 231, 235 (5th Cir. 2014)). Finding that genuine issues of material fact remained in dispute, we reversed the circuit court's grant of summary judgment to the defendants and remanded the matter for further proceedings. *Id.* at 1241 (¶37).

¶13. As with the caution tape at issue in *Keckley*, we agree here that the presence of a wet-floor sign in Pilot's vestibule, without more, fails to present an inherently dangerous condition and poses the type of danger a customer could reasonably expect to encounter on

7

a business's premises. We note, however, that as in *Keckley*, Womack did not allege that a safety feature in its expected and intended state of being caused her injuries. Rather, Womack testified, and the video footage confirmed, that Womack slipped and fell on a collapsed sign in the middle of Pilot's relatively small but highly trafficked vestibule. The ten minutes of video footage admitted at trial showed that one customer knocked over the wet-floor sign, a second customer slipped on the collapsed sign and slid it to the middle of the vestibule, a third customer stepped on the collapsed sign, and a fourth customer narrowly avoided the collapsed sign before Womack entered the convenience store and actually tripped over the collapsed sign.

¶14. When reviewing a jury's verdict in a civil case, this Court "will disturb [the] verdict only when convinced that . . . the final result will result in an unconscionable injustice." *Hegman v. Adcock*, 377 So. 3d 1020, 1030 (¶38) (Miss. Ct. App. 2024) (quoting *Erves v. Hosemann*, 335 So. 3d 603, 612 (¶18) (Miss. Ct. App. 2022)). "In determining whether a verdict is against the overwhelming weight of the evidence, we must accept as true the evidence presented as supportive of the verdict." *Id.* "Once a verdict has been returned in a civil case, we are not at liberty to direct that a judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical finder of fact could have made the same finding." *Id.* (citation and internal quotation mark omitted). As with the surprising "tripwire-like effect" of the caution tape in *Keckley*, which we held a reasonable jury could find to be a dangerous condition, the jury here could and did find that the unexpected position of the

8

wet-floor sign in Pilot's vestibule also "create[d] an unreasonable or unusually dangerous condition" under the circumstances presented. *Keckley*, 276 So. 3d at 1238 (¶23). And based on our review of the record and relevant caselaw, we cannot find a sufficient basis upon which to reverse the jury's verdict with respect to this issue.

## II. Knowledge of the Condition

¶15. The Appellants next argue that even if Womack demonstrated the existence of a dangerous condition, another customer's act of knocking over the wet-floor sign could not impute knowledge of the condition to them. The Appellants also argue that the trial evidence failed to establish that they had either actual or constructive knowledge of the collapsed sign.

¶16. Included within a business owner's duties "to keep the premises reasonably safe" and "warn of dangerous conditions not readily apparent" is the "duty to conduct reasonable inspections to discover dangerous conditions existing on the premises." *Rhodes*, 376 So. 3d at 389 (¶¶11-12) (citations omitted). "[O]ur [Mississippi] Supreme Court has held that a premises owner's liability for failure to conduct reasonable inspections is limited[,]" however, in that "[t]here is no liability for harm resulting from risks the occupier did not know and could not have discovered with reasonable care." *Id.* at (¶12) (internal quotation marks omitted).

¶17. In addition, where a business owner's own negligence does not create the dangerous condition, "the plaintiff must prove that the [business owner] had actual or constructive knowledge of the condition." *Id.* at (¶13) (quoting *Gillespie v. Lamey*, 338 So. 3d 653, 657 (¶13) (Miss. Ct. App. 2022)). If "a dangerous condition on the premises is caused by a third

9

person unconnected with the store operation, the burden is upon the plaintiff to show that the operator had actual or constructive knowledge of its presence." *Carroll*, 309 So. 3d at 570 (¶6) (quoting *Patterson*, 270 So. 3d at 21 (¶7)). "Constructive knowledge is established by proof that the condition existed for such a length of time that, in the exercise of reasonable care, the proprietor should have known of [the condition]." *Lasseter v. AWH-BP Jackson Hotel LLC*, 380 So. 3d 232, 238 (¶22) (Miss. 2024) (quoting *Waller v. Dixieland Food Stores Inc.*, 492 So. 2d 283, 285 (Miss. 1986)).

¶18.    Here, the Appellants assert that Womack cannot "attribute the tripping hazard to Pilot" because it was "undisputed that a departing patron, not a Pilot employee, knocked over the sign." Moreover, the Appellants contend that ten minutes provided an insufficient length of time for Pilot to have known about the collapsed sign. In support of their arguments, the Appellants cite a Georgia case involving a customer's slip and fall in a bakery. *Warberg v. Saint Louis Bread Co.*, 565 S.E.2d 561, 562 (Ga. Ct. App. 2002). As the customer, Warberg, walked to the bakery counter to place her order, she stepped on a collapsed wet-floor sign, slipped, and fell backward. *Id.* At the time of Warberg's fall, there was a bakery employee (the cashier) standing behind the counter who operated the cash register and took customers' orders. *Id.* The cashier stated that she did not see Warberg fall. *Id.*

¶19.    In addition, the cashier stated that prior to Warberg's fall, she had not seen the wet-floor sign either standing upright or lying flat on the ground in the area where the incident occurred. *Id.* The cashier testified that she only looked up when another customer mentioned the fall. *Id.* At that point, the cashier saw Warberg on the floor with the collapsed

10

wet-floor sign on the ground beside her. *Id.* The cashier informed the bakery's general manager of the accident. *Id.* According to the general manager, he had "checked the area around the bakery for debris on the floor and general cleanliness" a few minutes before learning of Warberg's fall. *Id.* At the time of his inspection, the general manager noticed a wet-floor sign standing upright by a wall, but he did not see any debris on the floor. *Id.*

¶20.    On appeal from the trial court's grant of summary judgment to the bakery, Warberg alleged that the proximity of the cashier and the general manager to the fallen sign provided the bakery with constructive knowledge of the hazard. *Id.* at 563. Warberg asserted that the cashier "was in the immediate vicinity of the collapsed sign and could have seen it." *Id.* As the Georgia Court of Appeals noted, though, the cashier's testimony reflected that she saw the collapsed sign next to Warberg only after the fall, and no evidence "raise[d] a question of fact as to whether [the cashier] could have easily seen this hazard" during the short time that the sign lay collapsed "and taken action to correct it *before* Mrs. Warberg slipped." *Id.* at 564. As to the general manager, the appellate court pointed out that although he stated that he had seen an upright wet-floor sign prior to the incident, it was "[t]he *collapsed*" sign that had caused the fall, and Warberg had failed to present any evidence the general manager was either "in the immediate vicinity of or could have easily seen the flattened sign on which Mrs. Warberg fell." *Id.* at 563. The appellate court also explained that Warberg had "not raised a question of fact regarding the reasonableness of the [bakery's] inspection procedures[,]" and in previous cases "where a proprietor ha[d] shown that an inspection occurred within a brief period prior to an invitee's fall," the court had "held that the

11

inspection procedure was adequate as a matter of law." *Id.* at 564 (footnotes omitted).

¶21.    Upon review, we are not persuaded and find *Warberg* is distinguishable from the present case. As the Georgia court specifically noted in *Warberg*, the bakery's general manager stated that just prior to learning of Warberg's fall, he had inspected the bakery floor for debris. *Id.* at 562. Although the general manager in *Warberg* observed an upright wet-floor sign, he indicated that he had not seen either a collapsed wet-floor sign or other potential hazards to customers during his inspection. *Id.* Here, however, the record reflects no similar testimony from Pilot's employees that they performed a reasonable inspection in the period of time leading up to Womack's fall "to discover dangerous conditions existing on the premises." *Rhodes*, 376 So. 3d at 389 (¶12). Pilot's general manager, Franklin, testified that she performed a safety walk of the premises when she first arrived at the store around 8 a.m. Franklin provided no further testimony, though, that she performed additional safety inspections of the premises between the time she entered Pilot around 8 a.m. and when Womack entered the store almost three hours later around 11 a.m.

¶22.    Also in contrast to *Warberg*, Womack provided sufficient evidence for a jury to find that if an inspection of Pilot's premises had occurred, the employees reasonably could have discovered the collapsed wet-floor sign before she tripped over it. Unlike the more open area generally encountered in front of a business's counter and cash register area, Pilot's vestibule presented a small enclosed space that comprised the main point of entry into and out of the store's interior. The vestibule received a high volume of foot traffic as various customers continuously—and sometimes simultaneously—entered and exited the store. The video

12

footage from Pilot's cameras showed that although the doors on both sides of the vestibule were made of clear glass, the doors leading from the vestibule to the parking lot had large stickers across them that obstructed an approaching customer's view into the vestibule. In addition, Womack testified that at the time of her fall, sunlight shone on the vestibule doors facing the parking lot, which further decreased her ability to see inside the vestibule before she entered.

¶23. By contrast, the glass doors on the interior-store side of the vestibule were free of any stickers or signs and allowed a person standing nearby to look into the vestibule with an unobstructed view. In fact, Franklin acknowledged during her testimony that her view into the vestibule was unobstructed and that she was close enough to the vestibule to be able to see the wet-floor sign. Indeed, the video footage showed that at multiple points during the ten-minute interval between the collapse of the wet-floor sign and Womack's accident, Franklin was in the vicinity of the doors leading to the vestibule. The video footage reflected that Franklin walked directly back and forth in front of the glass doors, walked a few feet away from the doors, and stood facing directly toward the glass doors as she set up the hot dog station just inside the store.

¶24. Thus, unlike in *Warberg*, Womack presented evidence from which the jury reasonably could conclude that Pilot's employees not only had the opportunity to observe the collapsed sign inside the vestibule but also to take action to correct the hazard before Womack's fall. And because the record contains evidence from which the jury reasonably could have imputed constructive knowledge of the collapsed wet-floor sign to Pilot, we find no basis for

13

reversing the jury's verdict as to this issue.

### III.    Motion for a New Trial

¶25.    The Appellants also assert that the circuit court erred by denying their post-trial motion for a new trial.  In reviewing this issue,

> we afford the trial court substantial deference to its determination on the weight of the evidence issue and whether to grant a new trial.  We will only reverse when such denial amounts to an abuse of that judge's discretion. Additionally, we give great deference to the jury verdict itself.  A new trial may be granted where the verdict is against the overwhelming weight of the evidence or when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice.  Our role as appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.  Reversal is only proper when this Court is convinced that the trial court has abused its discretion in failing to grant a new trial.  Thus, the scope of review on this issue is limited in that all evidence must be construed in the light most favorable to the verdict.

*Kirk v. Newton*, 380 So. 3d 252, 266 (¶35) (Miss. Ct. App. 2023) (citations and internal quotation marks omitted).  Here, the Appellants contend that Womack's safety expert, Ken Goodrum, and her expert in orthopedic surgery, Dr. Chad Hosemann, provided opinions that were "unqualified, unreliable, and ever-changing . . . ."  In addition, the Appellants allege that the closing argument Womack's trial attorney made was intended to inflame the jury.

### A.    Goodrum's Expert Testimony

¶26.    The Appellants challenge Goodrum's statements regarding what Womack would have been able to see as she entered Pilot's vestibule and what Pilot's employees should have observed as they walked through the store's interior.  The Appellants assert that such opinions constituted human-factors testimony but that Goodrum neither had training or

14

expertise in that field nor was accepted as a human-factors expert. As a result, the Appellants argue that Goodrum was unqualified to offer such opinions. Moreover, the Appellants allege that Goodrum's opinions were based on his everyday experience and his review of Pilot's video footage rather than any specialized knowledge or accepted methodology. As a result, they also challenge his human-factors testimony as unreliable. With regard to any allegedly improper human-factors testimony that Goodrum may have offered, however, we note that the Appellants raised no contemporaneous objections at trial to such statements. "Well-established precedent holds 'that when a party fails to make a contemporaneous objection at trial, he waives any error on that issue on appeal.'" *Scott v. Boudreau*, 375 So. 3d 688, 697 (¶47) (Miss. Ct. App. 2023) (quoting *McCullough v. McCullough*, 52 So. 3d 373, 379 (¶25) (Miss. Ct. App. 2009)). Thus, with regard to the complained-of human-factors testimony, we find the Appellants failed to preserve this issue for appeal.

¶27.    The Appellants also argue that the circuit court erroneously accepted Goodrum as an expert in premises safety. Goodrum's career in the military, law enforcement, and private security dealt primarily with security issues. Thus, while the Appellants acknowledge that Goodrum's professional experience may have qualified him to testify as an expert in security measures, they contend that his expertise failed to extend to such general safety issues as the negligent placement of safety signs. As a result, the Appellants assert that Goodrum was unqualified to testify as a premises-safety expert. In addition, the Appellants allege that many of Goodrum's trial opinions were based not on specialized knowledge but on purported violations of Pilot's own policies and procedures. The Appellants therefore argue that

15

Goodrum's testimony as a premises-safety expert was not only unqualified but also unreliable and irrelevant.

¶28. When considering the admissibility of expert testimony, Mississippi Rule of Evidence 702 provides that

> expert testimony should be admitted only when the trial court can affirmatively answer a two-fold inquiry. The first prong mandates that a witness must be qualified by virtue of his or her knowledge, skill, experience, or education. Second, the witness's scientific, technical, or other specialized knowledge must assist the trier of fact to understand or decide a fact in issue. Put simply, the expert's proposed testimony must be both relevant to the case at hand and based on reliable methodology.

*Univ. of Miss. Med. Ctr. v. Kelly*, 358 So. 3d 1054, 1057 (¶10) (Miss. 2023) (citation and internal quotation marks omitted). The appellate courts review a trial court's decision to admit or exclude expert testimony for abuse of discretion. *Id.* at (¶9). In so doing, we may only reverse a case based on the admission or exclusion of evidence if the decision "results in prejudice and harm or adversely affects a substantial right of a party." *Chaupette v. State*, 136 So. 3d 1041, 1045 (¶7) (Miss. 2014) (footnote omitted).

¶29. Upon review, we agree that although Goodrum's "knowledge, skill, experience, training, [and] education" may have qualified him to testify as an expert in security matters, nothing that he provided qualified him to testify as an expert in premises safety. MRE 702. We further agree with the Appellants' argument that Goodrum's expert testimony was based not on any "specialized knowledge" or accepted and "reliable principles and methods . . . ." *Id.* Instead, as the Appellants point out, Goodrum's testimony about Pilot's violations of safety measures was based on his review of Pilot's internal policies and procedures and the

16

testimony of Pilot's employees. We therefore conclude that the circuit court abused its discretion in allowing Goodrum to testify as an expert in premises safety.

¶30. We further conclude, though, that any error in admitting Goodrum's expert testimony as to premises safety was harmless. As discussed, Mississippi appellate courts "may reverse a case only if[] the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Chaupette*, 136 So. 3d at 1045 (¶7) (citation and footnote omitted). Goodrum's testimony failed to prejudice the Appellants because the evidence Goodrum relied on had already been admitted into evidence during the testimony of other witnesses, and the opinions he gave were substantially similar to the testimony of those prior witnesses. Thus, we find that any error in allowing Goodrum to also testify to those matters failed to harm or prejudice the Appellants. *See Tuggle v. State*, 380 So. 3d 991, 997 (¶13) (Miss. Ct. App. 2024) (finding that even if error had occurred by allowing a witness to testify as an expert, any wrongfully admitted testimony would result in "harmless error because of the bulk of evidence corroborating" the expert's testimony). As a result, we find no basis for reversing the jury's verdict.

### B. Dr. Hosemann's Expert Testimony

¶31. The Appellants contend that the circuit court also erred by admitting the expert testimony of Dr. Hosemann, the orthopedic surgeon who performed Womack's independent medical examination (IME). Although the Appellants raised no challenge to Dr. Hosemann's qualifications to testify as an expert, they asserted that Dr. Hosemann's testimony was unreliable and that he provided a new opinion shortly before trial.

17

¶32. Dr. Hosemann noted in his IME findings that Womack had reported experiencing "very minimal achy pain in her knees" prior to her fall inside Pilot's vestibule. As of the date of the IME, Dr. Hosemann found that Womack had meniscal tears in her right knee and "end-stage osteoarthritis" in both knees. Dr. Hosemann opined that the "fall may have resulted in the meniscal tears" and had "dramatically aggravated" Womack's preexisting knee conditions, which included her osteoarthritis and pain. Most importantly, Dr. Hosemann found that Womack's fall had "significantly altered the natural course of her osteoarthritis" and had led "to the need for knee replacement much sooner than had she not fallen." Dr. Hosemann concluded that Womack would be unable to "gain any lasting relief without undergoing bilateral total knee replacement."

¶33. Dr. Hosemann's subsequent deposition testimony further reflected the opinions provided in his IME report. According to the deposition excerpts contained in the record, when asked what led him to opine that Womack's fall may have caused the meniscal tears in her right knee, Dr. Hosemann responded as follows: "Because meniscal tears can often times be caused from falls, and apparently, she had a fairly significant fall that resulted in her having to go to the hospital that day. So certainly a twisting knee type injury can result in a meniscus tear." Because only an MRI of Womack's right knee had been taken after her fall, Dr. Hosemann could not state whether Womack also had any meniscal tears in her left knee.

¶34. Regardless of when Womack's meniscal tears occurred, Dr. Hosemann opined that Womack needed knee surgery because of the fall and its aggravation of her preexisting knee conditions. At the time of Dr. Hosemann's deposition, Womack had undergone surgery on

18

her right knee but still awaited surgery on her left knee. During his deposition, Dr. Hosemann was asked whether he could "tie the need for a left knee total knee procedure to" Womack's fall. He answered, "Yes . . . ." He then explained that Womack "fell on both her knees, and they're arthritic. And she had to go to the ER, and she went to the doctor several times. It sounds to me like [the fall] really made her symptoms dramatically worse." In response to additional questions from Womack's attorney, Dr. Hosemann reiterated that Womack had preexisting osteoarthritis in both her knees that the fall aggravated, and based on the information Womack had provided to him, the fall was the reason she required knee surgery.

¶35. Prior to trial, the Appellants moved for partial summary judgment as to Womack's knee injuries. They argued that Dr. Hosemann's testimony had failed to establish that Womack's fall caused the meniscal tears in her right knee. As a result, the Appellants asserted that Womack had failed to sufficiently prove that her fall caused injuries that required her to undergo knee-replacement surgery.

¶36. In responding to the Appellants' motion, Womack provided an affidavit from Dr. Hosemann that stated the following:

> My opinions were and still are [that] Willa Womack had a fall on January 6, 2020[,] at the Pilot store where she landed on her knees. It was my opinion that the fall caused trauma to her knees and aggravated her preexisting condition of osteoarthritis.
>
> As I previously stated in my report and deposition, it was and still is my opinion that the fall and injury to her knees was the cause of her knee pain and the cause for her needing a right knee and left knee bilateral total knee replacement.

19

My opinion was that she also had medial and lateral meniscal tears in her knees. I do not understand the legal terms attorneys use so I stated the fall "may have" caused the meniscal tears that then led to a surgery. So that the record is clear on legal terminology[,] it is my opinion that Willa Womack's fall on January 6, 2020[,] caused the meniscal tears. Because Willa Womack reported she fell[,] I can say within a reasonable degree of medical probability that the fall caused the meniscal tears.

¶37. The Appellants then filed a reply to Womack's response and argued that Dr. Hosemann's affidavit attempted to change his testimony to include a new opinion about the meniscal tears. The Appellants asserted that the circuit court should exclude any change to Dr. Hosemann's opinions because the change lacked a reliable basis and had been untimely provided.

¶38. At a hearing on several pre-trial motions, the Appellants' attorneys argued the issues with Dr. Hosemann's opinions that they had raised in their reply to Womack's response to their motion for partial summary judgment. The Appellants again asserted that Dr. Hosemann's affidavit had provided a new opinion as to Womack's meniscal tears that was unreliable and untimely. In its subsequent order, the circuit court found that genuine issues of material fact existed as to Womack's alleged knee injuries. As a result, the circuit court denied the Appellants' motion for partial summary judgment as to that issue.

¶39. At trial, just before Dr. Hosemann testified, the Appellants stated that they wished to "renew [their] objection to his testimony based on the *Daubert* motion previously filed." When both the circuit judge and Womack's attorneys requested clarification as to which motion the Appellants were referring, the Appellants' attorney referenced the motion for partial summary judgment as to Womack's knee injuries, in which the Appellants had argued

20

that Womack's evidence failed to prove the fall caused a need for her knee surgeries. In making his argument, however, the Appellants' attorney stated that he did not "believe Dr. Hosemann's opinions were based on reliable methodology or otherwise helpful to the jury." The circuit judge again denied the motion. Before the circuit judge accepted Dr. Hosemann as an expert in orthopedic surgery, the Appellants provided that they would "rest on the arguments already stated." The circuit judge then admitted Dr. Hosemann as an expert witness.

¶40.    At trial, Dr. Hosemann gave testimony consistent with the findings contained in his IME report, which he had completed prior to the filing of the motion for partial summary judgment and the complained-of affidavit. In addition, his trial testimony was consistent with the excerpts included in the appellate record from his deposition. Dr. Hosemann stated at trial that prior to her fall, Womack had moderate arthritis in her knees. Dr. Hosemann also stated that although Womack had meniscal tears in her right knee after her fall, he could not tell if the tears predated her fall. Dr. Hosemann did testify, however, that meniscal tears were very common and that people continued to function with them all the time. Thus, even if Womack had meniscal tears before her fall, Dr. Hosemann explained that their presence would not necessarily require her to imminently need knee surgery. Rather, in his expert opinion, Dr. Hosemann testified that Womack's need for knee surgery resulted from the trauma caused by her fall at Pilot on January 6, 2020.

¶41.    Following trial, the Appellants filed a motion for a new trial that included a heading asserting they were "entitled to a new trial because Dr. Hosemann's opinions were

21

inadmissible." The Appellants then stated that "Dr. Hosemann's testimony justifies a new trial for the same reasons that it justifies a JNOV." They further stated that they incorporated the arguments raised in their motion for JNOV. In the motion for JNOV, the Appellants reasserted their pretrial argument that Womack's evidence, particularly Dr. Hosemann's testimony, had failed to prove "to a reasonable degree of medical certainty that the accident caused her to need knee surgery." The Appellants did not, however, reassert their pretrial claims that Dr. Hosemann's affidavit opinion regarding Womack's meniscal tears was either unreliable or untimely provided. On appeal, the Appellants now contend that Dr. Hosemann's testimony was unreliable under Rule 702 and changed shortly before trial. They therefore allege that the circuit court erred by denying their motion to exclude Dr. Hosemann's trial testimony and compounded the error by denying their motion for a new trial.

¶42. Despite the Appellants' contentions on appeal, the record reflects that they raised a different argument as to Dr. Hosemann's testimony in their motion for a new trial. Our caselaw is clear that the failure to raise an issue in a motion for a new trial procedurally bars the claim on appeal. *Bradford v. State*, 391 So. 3d 1254, 1268 (¶35) (Miss. Ct. App. 2024). Procedural bar notwithstanding, we find that any error related to Dr. Hosemann's expert testimony was harmless. Dr. Hosemann's trial testimony was based on and consistent with the original findings provided in his IME report. Moreover, his testimony and any discrepancies with prior statements or other admissible trial evidence were subject to thorough cross-examination by the Appellants' attorneys. Viewing the evidence before us

22

in a light most favorable to the verdict, and affording the circuit court substantial deference in its decision to deny the Appellants' motion for a new trial, we remain unconvinced that the circuit court abused its discretion. *Kirk*, 380 So. 3d at 266 (¶35). We therefore decline to reverse the circuit court's determination as to this issue.

### C. Closing Argument

¶43. The Appellants next allege that Womack's trial attorneys improperly employed "us-versus-them," "conscience-of-the-community," "send-a-message," and "golden-rule" themes throughout their closing argument. With regard to claims of impermissible closing-argument comments,

> [i]t is well settled that to preserve an objection to alleged improper remarks by counsel during closing argument, the complaining party must not only make a contemporaneous and specific objection to the remarks, but [he] must also obtain a definitive ruling from the trial court on his objection and must request corrective action.

*Mai v. State*, 384 So. 3d 1242, 1253 (¶34) (Miss. Ct. App. 2024) (quoting *Rials v. Duckworth*, 822 So. 2d 283, 287 (¶22) (Miss. 2002)). "[W]here an objection is made and a definitive ruling is not obtained nor any corrective action requested[,]" the complaining party "waives his objection . . . ." *Rials*, 822 So. 2d at 288 (¶22) (quoting *Walters v. State*, 720 So. 2d 856, 864 (¶25) (Miss. 1998)).

¶44. Here, during Womack's closing argument, one of the Appellants' attorneys asked to approach the circuit judge. In the bench conference that followed, the Appellants' attorney told the circuit judge that he hated to interrupt closing argument but that he had allowed Womack's attorney to go as far as he could. The Appellants' attorney then stated that the

litigation was "not about us against them, Hinds County versus them. This is about the facts of this case." The circuit judge ordered Womack's attorney to move along in his argument, and the bench conference ended. Based upon our review, even if we were to find that the Appellants raised "a contemporaneous and specific objection" to remarks made by Womack's attorney during closing argument, the record fails to reflect that the Appellants "also obtain[ed] a definitive ruling from the trial court on [the] objection and . . . request[ed] corrective action." *Mai*, 384 So. 3d at 1253 (¶34) (quoting *Rials*, 822 So. 2d at 287 (¶22)). We therefore find that the Appellants waived this issue for appellate review. *Rials*, 822 So. 2d at 288 (¶22).

¶45. Notwithstanding the waiver, we also find that this issue lacks merit. "[A]ttorneys are to be given wide latitude in making their closing arguments." *Carr v. State*, 385 So. 3d 1300, 1305 (¶14) (Miss. Ct. App. 2024) (quoting *Spiers v. State*, 361 So. 3d 643, 662 (¶71) (Miss. 2023)). "'[W]ide latitude of discussion is allowed' as long as the [attorney] 'keeps fairly within the evidence and issues involved.'" *Id.* (quoting *Spiers*, 361 So. 3d at 662 (¶71)). Our caselaw prohibits attorneys from using "tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Id.* Error occurs when an attorney "departs entirely from the evidence in his arguments or makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence." *Id.* (quoting *Spiers*, 361 So. 3d at 662-63 (¶71)). When viewed in context, we can find no reason for reversal due to the allegedly improper closing-argument remarks made by Womack's attorney. Because we

24

cannot conclude that the comments at issue entirely departed from the evidence, were intended solely to inflame the jury, or "create[d] such an unjust prejudice against the [Appellants] as to result in a decision influenced by the prejudice so created[,]" we will not reverse the jury's verdict based on this issue.

### IV. Award of Non-Economic Damages

¶46. The jury considered Womack's evidence that her past and future medical expenses amounted to $393,000 and awarded her that amount for economic damages. The jury also awarded Womack $3,000,000 for non-economic damages. In compliance with the statutory limit for non-economic damages, the circuit court reduced that portion of Womack's award to $1,000,000. *See* Miss. Code Ann. § 11-1-60(2)(b). Thus, Womack received a total monetary award of $1,393,000. On appeal, however, the Appellants argue that despite the circuit court's remittitur of Womack's non-economic-damages award, the amount remains excessive and requires further reduction.

¶47. We review for abuse of discretion the circuit court's denial of the Appellants' request for further remittitur of Womack's non-economic-damages award. *See MIMG C Woodridge Sub LLC v. Course*, 356 So. 3d 1246, 1251 (¶35) (Miss. Ct. App. 2023). Regarding this issue, we have explained that

> we will not disturb the trier of fact's award of damages unless its size, in comparison to the actual amount of damage, shocks the conscience. A remittitur is appropriate when either (1) the trier of fact was influenced by bias, prejudice, or passion, or (2) the damages were contrary to the overwhelming weight of the evidence. The bias, prejudice, or passion standard is purely a circumstantial standard. Evidence of corruption, passion, prejudice, or bias on the part of the trier of fact (if any) is an inference to be drawn from contrasting the amount of the verdict with the amount of the damages.

25

*Miss. Dep't of Rehab. Servs. v. Butler*, 384 So. 3d 546, 557 (¶36) (Miss. Ct. App. 2024) (quoting *MIMG C Woodridge Sub LLC*, 356 So. 3d at 1251 (¶35)).

¶48.    In addition,

> we proceed on a case-by-case basis in determining whether a jury award is excessive. Even if we think the amount awarded in the verdict is liberal, we are not allowed to supplant our judgment for that of the jury unless we conclude that there was insufficient evidence to support the award of damages. We are required to view the evidence in a light most favorable to the jury's verdict, giving [the verdict] the benefit of all favorable inferences that may reasonably be drawn.
>
> Also, while pain and suffering is, to a large degree, not susceptible to monetary quantification, the jury necessarily has especially broad leeway.

*MIMG C Woodridge Sub LLC*, 356 So. 3d at 1251 (¶¶36-37) (citations and internal quotation marks omitted).

¶49.    Here, the jury's award to Womack of $3,000,000 in non-economic damages amounted to about 7.6 times the total economic damages of $393,000 that Womack received for past and future medical expenses. As we recently noted, however, throughout the years, Mississippi "appellate courts have examined this issue many times and approved verdicts in a great range." *Id.* at (¶38) (affirming jury's verdict of non-economic damages for almost 10.7 times the award for economic damages).

¶50.    In addition to the evidence of her past and future medical expenses, Womack presented testimony—not only her own but also that of other witnesses—regarding the physical and emotional effects she had experienced due to her fall. The evidence included testimony about the trauma to Womack's neck, back, and knees; the permanent scarring to her right knee; the need for a knee brace on her left knee as well as injections and physical

therapy for her various injuries; her reduced mobility and stability during daily activities; and her increased dizziness, anxiety, and depression.

¶51.   "It is the jury who determines the weight of the testimony and the credibility of the witnesses at trial[,] and it is the primary province of the jury to determine the amount of damages to award." *Robb v. McLaughlin*, 371 So. 3d 761, 778 (¶48) (Miss. Ct. App. 2023) (quoting *Colville v. Davidson*, 934 So. 2d 1028, 1032 (¶14) (Miss. Ct. App. 2006)).  In light of the proof presented at trial and the deference afforded to the jury in reaching its verdict, we cannot say that the jury's non-economic-damages award to Womack was so excessive as to be characterized as "beyond all measure, unreasonable in amount[,] and outrageous." *MIMG C Woodridge Sub LLC*, 356 So. 3d at 1254 (¶58) (quoting *Miss. State Fed'n of Colored Women's Club Hous. for Elderly in Clinton Inc. v. L.R.*, 62 So. 3d 351, 368 (¶58) (Miss. 2010)).  We therefore find no abuse of discretion in the circuit court's denial of the Appellants' request to further reduce Womack's non-economic-damages award.

## CONCLUSION

¶52.   Because we find no reversible error, we affirm the circuit court's amended final judgment awarding Womack $1,393,000 in damages.

¶53.   **AFFIRMED.**

**CARLTON, P.J., McDONALD, LAWRENCE, McCARTY AND WEDDLE, JJ., CONCUR.  WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  EMFINGER, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.  WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J.; WESTBROOKS, J., JOINS IN PART.**

**WILSON, P.J., DISSENTING:**

27

¶54. I concur with the majority that the trial court abused its discretion by allowing Kenneth Goodrum to testify "as a safety expert." However, I disagree that the error can be disregarded as harmless. Accordingly, I respectfully dissent.

¶55. Under Mississippi Rule of Evidence 702, expert testimony is admissible only if the proponent shows that

(a)     [the witness possesses] scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

MRE 702. Applying Rule 702, our Supreme Court has held that

expert testimony should be admitted only if it withstands a two-pronged inquiry. First, the witness must be qualified by virtue of his or her knowledge, skill, experience or education. Second, the witness's scientific, technical or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue. In addition, Rule 702 does not relax the traditional standards for determining that the witness is indeed qualified to speak an opinion on a matter within a purported field of knowledge.

*Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35 (¶7) (Miss. 2003) (quotation marks and citations omitted). Further, "[a]n expert is qualified only if the witness possesses scientific, technical, or specialized knowledge *on the particular topic* of his opinion." *Hyundai Motor Am. v. Hutton*, 328 So. 3d 592, 604 (¶47) (Miss. 2021) (quotation marks and brackets omitted).

¶56. "The proponent of expert testimony has the burden of establishing the admissibility

of such testimony." *Scarborough v. Logan*, No. 2022-CA-00965-SCT, 2024 WL 4510804, at *4 (¶12) (Miss. Oct. 17, 2024) (quoting *Univ. of Miss. Med. Ctr. v. Kelly*, 358 So. 3d 1054, 1058 (¶14) (Miss. 2023)). Under Rule 702, "[t]he trial court is vested with a 'gatekeeping responsibility.'" *McLemore*, 863 So. 2d at 36 (¶11) (quoting *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993)). The trial court has a "duty to determine whether or not a witness is qualified." *Evans v. State*, 25 So. 3d 1054, 1060 (¶15) (Miss. 2010). The trial court also must determine whether the testimony will be helpful to the trier of fact and whether it is based on a reliable methodology reliably applied to the facts of the case. *Corrothers v. State*, 148 So. 3d 278, 294-95 (¶¶24-26) (Miss. 2014).

¶57. In this case, Kenneth Goodrum testified that after high school, he served in the military on active duty for two years, worked as a private security guard for two years, and was a patrol officer for the University of Mississippi Medical Center for two years. He then served with the Jackson Police Department (JPD) for twenty years, eventually earning a promotion to the rank of precinct commander. Since retiring from JPD, Goodrum has owned a private security firm that provides patrol and security services for a subdivision in Jackson. Goodrum has previously testified as an expert regarding *security* issues in premises liability cases involving violent crimes, but this is the first time he has testified as an expert in a slip-and-fall case.

¶58. Prior to trial, the defendants moved to exclude Goodrum from testifying as an expert, arguing that he "possesse[d] no scientific, technical, or other specialized knowledge as to warnings or wet floor signs." However, the trial court denied the defendants' motion. At

29

trial, Womack tendered Goodrum "as a safety expert." Over the defendants' renewed objection, the trial court allowed Goodrum to testify as a safety expert.

¶59. At trial, Goodrum described his "methodology" as follows:

> A methodology is how you go about to look at an incident, plain and simple. Different fields have their own different methodologies. I use a group of books, as it relates to investigating, as well as looking at the floors and the policies, the procedures for the company. I look at the codes that the city sets forth. I, also, look at industry standards. That means, for Pilot what do they use as their policy as it relates to safety. I look at their policies and their standards. And I go down a checklist, look at it, decide what's going on, what happened, and I just follow a checklist to determine if anything was done right and anything was done wrong. And then, I use all the information given to me, with the evidence that the lawyer has -- the defense and the plaintiff's attorneys have given, and I use that to determine and give my opinions.

Goodrum then testified that his methodology and opinions in this case did not depend on any codes or industry standards; rather, this case was about alleged violations of "[p]olicies and procedures that the company [(i.e., Pilot)] set forth."

¶60. Goodrum then read from Pilot's internal training materials and policies and opined that Pilot's employees violated company policies by leaving the wet-floor sign out too long, placing a floor mat in the vestibule,[1] failing to "regularly check key travel paths," failing to "visually assess walk areas for slip and fall hazards," and not "keeping the walkways clear from hazards." Goodrum testified that Pilot committed five different violations of its own

---

[1] Although Goodrum testified that Pilot's policies prohibited placing a floor mat in the vestibule, there is no evidence that the floor mat had anything to do with the incident in this case. On cross-examination, Goodrum acknowledged that standards promulgated by the American Society for Testing and Materials (ASTM) state that "[b]uilding entrances shall be provided with mats or runners, or other means to help remove foreign particles and other contaminants from the bottom of pedestrian footwear." However, Goodrum testified that he would put "more weight [on Pilot's] policies than the [ASTM standards]."

policies and that those violations caused Womack's fall.

¶61.    As the majority acknowledges, the trial court abused its discretion by allowing Goodrum to testify "as a safety expert" because nothing in his experience, training, or education qualified him as an expert in the proper placement of warning signs or slip-and-fall prevention.  In addition, as the majority acknowledges, Goodrum's testimony also should have been excluded because he did not employ any reliable principles or methods.  As Goodrum himself explained, his "methodology" was simply to read Pilot's policies and identify alleged violations.

¶62.    I would add that Goodrum's testimony also should have been excluded because it was utterly unhelpful to the jury.  *See* MRE 702 (providing expert testimony is inadmissible unless it "will help the trier of fact to understand the evidence or to determine a fact in issue").  Again, Goodrum simply read Pilot's policies and identified alleged violations.  The average juror is as every bit as capable and qualified as Goodrum to read convenience store policies and decide, as Goodrum put it, whether "anything was done wrong."  "[T]he conclusion that [Goodrum] reached was one that could have been reached by the jury . . . without expert guidance.  It follows that the trial court erred in allowing this testimony . . . because the opinion rendered and explanation thereof demonstrated that it was not helpful to the trier of fact." *Seal v. Miller*, 605 So. 2d 240, 244 (Miss. 1992); *see also Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (holding that "[e]xpert testimony was unnecessary" and properly excluded because "the jury could adeptly assess [the issues] using only their common experience and knowledge").

¶63. While I agree with the majority that the trial court erred by admitting Goodrum's testimony, I respectfully disagree that the error can be disregarded as "harmless." The trial court told the jury that "[t]he court [would] accept [Goodrum] as an expert." As other courts have recognized, "[t]here is often an inherent danger with expert testimony unduly biasing the jury because of its aura of special reliability and trust." *United States v. Litzky*, 18 F.4th 1296, 1304 n.3 (11th Cir. 2021) (quoting *United States v. Boney*, 977 F.2d 624, 631 (D.C. Cir. 1992)). As the United States Court of Appeals for the First Circuit has explained,

> because of an expert's stature qua expert, jurors may assign more weight to expert testimony than it deserves. Because such testimony can carry with it an unwarranted aura of special reliability and trustworthiness, courts must guard against letting it intrude in areas that jurors, by dint of common experience, are uniquely competent to judge without the aid of experts.

*United States v. Pires*, 642 F.3d 1, 12 (1st Cir. 2011) (citations and quotation marks omitted). This is exactly what occurred here. An unqualified "expert" was allowed to tell the jury that Pilot's employees were negligent and that their negligence caused Womack's injuries despite the fact that the jurors were "uniquely competent to judge" those issues based on their own "common experience" and "without the aid of experts." *Id.* Moreover, Goodrum's stature as a longtime JPD officer exacerbated the risk that the jury would give his "expert" opinions more weight than they deserved. The Mississippi Supreme Court has held that "because the public hold police officers in great trust, the potential harm to the objecting party requires reversal where a police officer gives expert testimony without first being qualified as such." *Kirk v. State*, 160 So. 3d 685, 693 (¶19) (Miss. 2015) (brackets omitted) (quoting *Roberts v. Grafe Auto Co.*, 701 So. 2d 1093, 1099 (Miss. 1997)). Allowing such an unqualified

"expert" to offer unreliable and unhelpful opinions on the ultimate issue in the case is "inconsistent with substantial justice" and "affect[ed]" the defendants' "substantial rights." M.R.C.P. 61. Accordingly, the error is not harmless and requires a new trial.[2] *Id.* Since the majority instead affirms, I respectfully dissent.

**BARNES, C.J., JOINS THIS OPINION. WESTBROOKS, J., JOINS THIS OPINION IN PART.**

---

[2] It is true, as the majority notes, that the documents that Goodrum read from were already in evidence. However, defendant Gina Franklin and Pilot employee Latosha McGriggs testified that they complied with applicable store policies on the day in question. The evidence in this case was not overwhelming and could have supported a defense verdict on the issue of liability. Goodrum's improper "expert" opinion that Pilot's employees were negligent and caused Womack's injuries cannot be dismissed as merely cumulative. Under these circumstances, it is impossible to say with confidence that the erroneous admission of the testimony of a purported expert was harmless.